Okay, we'll now hear number 25-1335 Maccagnan v. Cherry Creek School District Maccanan, your honor. Maccanan. Thank you. Wait one moment until the door is closed in the back. I apologize for the mispronunciation. No, no, no. I am pretty short. I think you can also turn, yeah. Okay, good, good. Counsel, proceed. Thank you, your honor. I'm Patricia Bangert here representing Ms. Maccagnan in this case, and if it pleases the court. Ms. Maccagnan was an educator for 25 years. She spent the last six years of her career as a principal. In 2020, she was terminated as a principal and demoted to the position of assistant principal. The reason given was loss of confidence of staff. Now, it's an interesting concept. It wasn't defined anywhere. It was first used with regard to, excuse me, a woman principal, Chris Tolliver. And then it was used to demote Ms. Maccagnan. Was it not also used against some men? I thought you distinguished a couple of cases involving men where it was used because they had other problems. Yes, your honor. But they still used the term loss of confidence, and that was a factor. Am I wrong about that? No, they did really after the fact. And what we have here is a standard for two women, and that standard was loss of confidence of staff. The standard, on the other hand, for the men was loss of confidence of staff plus. The men had issues from credit card misuse to sexual harassment and assault. But your burden, isn't it to show a comparable male who wasn't disciplined? In other words, maybe there aren't any examples of males who had also lost confidence of staff and who were retained. And if that's the case, how are you going to establish your discrimination claim? And that's a major issue here, your honor. We do have a male who, like Ms. Maccagnan, had a bad union listening tour. And a union listening tour is when the union goes out and talks to teachers. I will note here that Superintendent Siegfried said that he would never make a decision to terminate someone or to demote them just on a union listening tour alone. So we have Ms. Maccagnan has a union listening tour. Mr. Langdon, Ryan Langdon, has a bad union listening tour. Mr. Langdon, Ms. Maccagnan, is terminated three, four months after the bad union listening tour and is given no additional assistance. Mr. Langdon, on the other hand, is given two years to improve and is given... The issue there, though... I'm sorry, your honor. The issue there, though, is that the supervisors making the decision were different. And you're going to say that, well, the school board did both, but the school board doesn't really get involved in those matters. They just accept the employers, the employees who are high up in the hierarchy, just accepts their recommendation. How do you get around that? Two things, your honor. One, as we note in our brief, and I don't have the exact page, as we note in our brief, all of the same characters were involved. For example, Superintendent Siegfried did supervise, was the supervisor of Mr. Langdon for a certain point of time. And I think when he got the bad union listening tour. Scott, the succeeding Superintendent Scott, was the chief of staff and involved in Ms. Maccagnan's demotion. Ms. Roybal, as you can see from our chart, which I can't find exactly right now, all the same people were involved, just in different capacities. But I think the most important thing is that the board was involved. The board is the final say. There was testimony that a member of, or there was evidence that a member of the board, the head of the board, actually went to, in Ms. Maccagnan's case, actually went to the Superintendent Siegfried and discussed Ms. Maccagnan. So I think it's not. Is that mentioned in your brief? I don't remember that. Is that mentioned in your brief in this court? It is not mentioned in the brief in this court. Is that a problem for you? Because we don't usually, we usually limit you to the arguments in your brief. Yes, Your Honor, but that goes to the. That would be very relevant. But if you didn't, if you didn't argue the point in your opening brief, we usually don't consider it. It's in the record, though, Your Honor. This happens all the time. We don't consider stuff in the record that's not directed to our attention in your briefing. Now, it is in the briefs for the summary judgment. And what I'm arguing here is about the court's denial of our summary judgment motion. Once we get to that point where the court is denying the claim, there's nothing we can do in trial. So you're right, Your Honor. But I think that it is in the record. And it is something that is relevant. And in addition, the board is the final decision maker. And what is in the record is that the board confers with Dr. Siegfried, Dr. Smith. I don't know if he's a doctor or not, but I'll give him that. Dr. Smith. And it is involved. There's a lot in the record. Cherry Creek says the board doesn't know anything. I mean, the board is the final decision maker. Can I interrupt? I'd like you to step back just a minute. You were talking about the comparators, the four comparators and the two males. And it looked to me like your argument morphed from your opening brief, where you argued this was an evidentiary issue and presumably an abuse of discretion standard, because there was an objection to the admission of the male comparators. And so we would look at that under an abuse of discretion standard. But then in your reply brief, you seemed to drop that and you seemed to be arguing, well, the district court erred in its analysis of the, essentially the importance of these comparators in the Rule 50A analysis. And so it made the wrong decision. Well, that's a de novo review for us, and there's a big difference there. So I wondered if you were aware of the morphing of the argument. And aren't we kind of stuck with your first argument, your opening argument, which is your abuse of discretion standard argument? I think it's both. Well, you can't, you've got to make it in your opening brief if you want it to be both. Okay. Well. And you didn't, you didn't reassert that in your, you didn't reassert the abuse of discretion in your pride, you just kind of dropped it. What we were doing in the reply, Your Honor, was to reply to the specific arguments of the, of Cherry Creek. Okay. And so we, because of space limitations, we were not, we weren't repeating everything, Your Honor. Okay. So I hope that answers your question.  Yeah, thank you. But a couple things with regard to summary judgment, and I think that's probably one of the more important issues. One is, and this is just a weird issue, in the summary judgment opinion, the judge clearly denied summary judgment on the equal protection claim against the district. And in our brief, we indicate where she does that. She denies the claim. In a pretrial conference, she denies that she denied the claim. It was one of the weirder situations I've been involved in. So if you look at summary judgment, the opinion, the court allows the claim against the district, equal protection claim, to go forward. Then in the pretrial conference, and we've noted the citations, she says, no, no, I didn't do that. And arguments were made regarding respondeat superior, but she interrupted those arguments and said, nope, nope, I've already decided this. So we're arguing that the dismissal of that claim was arbitrary, capricious, not based on law, and not based on any of the facts. Can you address your Equal Pay Act claim? As I understand it, your claim, you're conceding that there definitely was a seniority system that was based on years of administrative experience in certain types of roles for principals. Yes. And the district did pay administrators based on that experience. Yes. But if I'm understanding your argument correctly, you're suggesting that nevertheless they deviated from those written policies with respect to at least one similar coordinator position, because she didn't get credit for a coordinator position that was mostly online, and perhaps they deviated from that for someone else. Is that, what's your argument about that? Because it seems to me the district, the school said they, you know, they used these policies. I think they even had an audit, a full audit of these policies, and people were paid according to these policies as determined by an independent third party. So how does this argument about this possible kind of off-the-books characterization of this other position play into this? I think the gravamen of this is the burden is on Cherry Creek to show the disparity in pay. Well, then they showed. They showed they have these policies that they fully complied with and had a full audit of. But you audited every single principal in the district to make sure they were compliant with the policy. They had those policies.  So let me go back. Up until 2018, I think it was, up until 2018, Ms. Mackinnon was paid at a certain level, and she was paid at that level because she had so many years of experience. All her experience. I understand the facts. I understand that she claims she should have been paid based on this coordinator position that gave her some experience, but the school doesn't, the district doesn't allow for that, right? I understand her claim. I'm just saying what the difference is, here she's paid this amount, and all the policies were, so in 2018, let's say, she was paid this amount and given credit. 2019, all of a sudden, no. All the policies were the same. Nothing had changed. And they did an audit, though, right? Didn't they do an audit? Yes. By an independent third party. But there was nothing in that audit, Your Honor, that changed the basic standards. The standards were the same. It's just all of a sudden, I guess I'll leave it at that and reserve the last 26 minutes. I just wanted to ask you a question about Mr. Langdon. Of course, Your Honor. And the argument that he was treated more favorably. Yes, Your Honor. So he was given, they each had the listening tour, but he was given extended time to cure whatever the problems were. She wasn't. Is that basically your argument? Yes, Your Honor. He was given two years to improve, and he was given an assistant, and he was given much more assistance from Cherry Creek, from the district. And it was Mr. Mueller who was the supervisor who gave him the extra two years? Yes, Your Honor. Yes. But Dr. Roybal, who was your client's supervisor, didn't give her extra two years. Absolutely, Your Honor. The union tour was, I think, in December of 2019. So we have the differential treatment, but the decisions were made by different supervisors. Well, there's a case, there are cases saying that the immediate supervisor doesn't matter. It's the ultimate decision maker, and the ultimate decision maker here is the board. I understand your argument. I just wanted to clarify that point. Thank you, counsel. Thank you, Your Honor. I'll give you a very short time for rebuttal, so you can be thinking about that, but your time will be quite limited. Thank you. I am Holly Ortiz. I represent all defendants' appellees. May it please the court. This is a case that is quite simply not about an individual that was targeted because of her sex. This is a case about an individual who just was not a very good leader and lost the confidence in her staff. The issues in this case involve both the grant of summary judgment and the Rule 50 motion, and then, of course, there are the evidentiary issues. And if we look at the evidentiary issues, and let's start with the ones that were raised by the court today. For example, Mr. Langdon as a comparator. The case law says that to be similarly situated, the individual needs to have the same supervisor or decision maker. It does not say ultimate decision maker. It says decision maker. And in this case, Langdon was supervised by Molnar, Derek Molnar. Macignan was supervised by Diana Roybal. The individual who made the decision as to how long to give improvement and what supports to give were Langdon and Molnar. That's the relevant decision maker here. And if we want to go to the next layer of decision maker, which would be the decision maker with respect to who is being recommended for demotion, it's not the same person either. For Langdon, it was Chris Smith. Siegfried was gone by that time. He wasn't even at the district anymore, and neither was Roybal. For Macignan, the superintendent who recommended demotion, who actually demoted, he testified the decision was his. And he said, I demoted her. He said, I own that, and that is in the record, was Siegfried. It seems like there was some overlap in the chain of supervision for both of them and some group decision making about the demotion. Why can't she make the argument that there was sufficient overlap that would allow the comparator evidence relating to Langdon to be considered? Because while there is some overlap in who was employed when, there is not any evidence that there's overlap with Langdon and who made the decisions. The evidence in the record shows the person that made the decision with respect to what supports he got was Molnar. I'm talking about the demotion. I understand your first point, the demotion decision. The evidence with the demotion is the person who made the demotion for Langdon was Chris Smith. He was not even involved in any way, shape, or form in the demotion decision for Macignan. He was her supervisor before she even got to the last school she was at. He was her supervisor at the challenge school for a very brief period of time and had nothing to do with supervising her or making any decisions after that, and there's nothing in the record to support that he was in any way involved with her demotion. He wasn't. Siegfried testified, and it was undisputed. I own that. I made that decision, and we don't have that. What about the argument that the board made the decision in both instances? How do you respond to that? Well, the board didn't make the decision. Siegfried said, I made the decision. To the extent the board voted on a consent agenda for a recommendation, that is not. Is that what happened? Well, there's testimony. The consent agenda that they just summarily voted on? There was testimony from one board member that she was asked, did the board vote on Macignan's demotion? And her testimony was, I think so. That's the only testimony we have that the board. That doesn't mean she did.  But there's a decision, so you don't remember three weeks later. Right. But the burden of proof here is on plaintiff. And the rest of the evidence, Siegfried's testimony, is that was my decision. They didn't vote on that. Brenda Smith, who was the HR director's testimony, said that was not their decision. Jennifer Perry said this was Siegfried's decision. The only evidence we have that it was actually the board's decision is one board member going, I think we did. Well, let's say the board did approve, ratify, confirm, whatever you want to call it. Does the case law in this area shed any light on whether it matters? In other words, if the superintendent says I'm making the decision, is that the end of the matter as a matter of law? Or is this a question that is more factual in nature, that maybe you have a more active board, they actually hear some presentation and they vote or something like that? Is there any case law that sheds some light on how we should look at that? So I think the lawyerly answer I'll give you is it depends on what the claim is. In the instance, for example, of a Section 1983 claim, when we're in the realm of the final policymaker for the district, that makes a difference. A decision maker is not the same thing as a policymaker. The decision maker, which is what the case law says is relevant as far as being similarly situated, is the person who made the decision. In this case, the undisputed evidence in the record is that that was Siegfried. Even if the board later voted to approve it, Siegfried made the decision, and that's what the record reflects. And more importantly, the decision, the disparate treatment allegation that Plaintiff is trying to make, that Ms. McEnyan is trying to make, that Langdon should have been a comparator, is because he supposedly got two years and she only got a few months. He got support and she didn't. I would note that's not reflected in the record. She got a lot of support, too. But the decision maker for that, for what they're basing the disparate treatment on, were Roybal and Molnar. That's the relevant decision maker here. Not the fact that the board, who had no knowledge, there's no evidence they knew of anything that happened between Roybal and McEnyan and Molnar and Langdon. There's no evidence that the board knew Langdon got more time. There's no evidence that the board knew that Langdon supposedly got more support. So you can't impute a discriminatory animus to an entity that didn't know anything about it. What you've got to look at is who made the decision. The decision was made by Molnar and Roybal. And if you want to go to the ultimate decision on who recommended expulsion, or expulsion, who recommended demotion, that would be Siegfried and Smith. And I think the case law is very clear. It's the decision maker, and that's who we're talking about here. The other problem with saying the board made the decision is there's no evidence the board was the same for the two individuals across the time. There's no evidence of that in the record at all. How much separation in time was there between the two decisions? Langdon was demoted two years after McEnyan left the district. So a significant chunk of time had gone by. Along that line, the other issue that I think got raised during Ms. Bangert's part of this was the issue with regard to experience on the EPA claim. And the record is very clear. The documents are very clear that from 2008 until after her demotion, actually, the administrator handbook set forth the positions that would be counted as relevant experience. And those included an A to the P, assistant to the principal, an AP, an assistant principal, a principal, an activities or athletic director, and a position called a COSA. And a COSA, and Judge Moritz, you had asked Ms. Bangert about this other coordinator position. That is the COSA position. And the testimony in the record regarding the COSA position is it counted as that one position counted as administrative experience because it was the equivalent of a dean position and had administrative duties. Significantly, there is no documentation anywhere. And all the testimony says that no coordinator other than the one specific one identified by the district, no other individual who was a coordinator was given credit for coordinator experience. It just didn't happen. In fact, there's testimonial evidence from that from Brenda Smith and from Dr. Perry. The fact that the district in the written documents sets forth these are the positions we'll give experience for, and the only coordinator position they had was the COSA position, which Ms. McEnyan admitted she never held, shows that the district intentionally excluded all other coordinator positions or wouldn't have included the one that counted. Ms. McEnyan makes an argument in her brief that, well, what really should be counted was her experience as an online learning coordinator, which was not a COSA. An online learning coordinator was a lot like an administrator, and she argues that there is evidence in the written handbooks that the experience should be considered based upon what the duties were. But the documents in this case don't support that. The section that she is citing to lists six factors that are considered for salary schedules. One of those is experience, is, I'm sorry, responsibilities you've held. A second one is experience, and you can't conflate the two. They're not conflated in the documents. They're not conflated here. And here the experience that counted as relevant experience is a COSA, an A to the P, an AP, an athletic or activities director, or a principal. You're distinguishing experience from what was the other category? McEnyan has argued that the fact that her duties as an online learning coordinator were a lot like administrative duties and has argued that under the handbook that means she had relevant experience, but that's not what the handbook says. Can I ask you to direct you to the dismissal of the Rule 50 ruling on the sex stereotyping claim, the Title IX? Absolutely. So she testified, the plaintiff did, that she definitely perceived a number of comments that she received. It sounds like individually as well as through this audit, that she was being stereotyped and she gave specifics and then there were more, many, many more of these same comments that she points to in this audit report. I may not be giving it the correct title, but she needed to be more nurturing. She needed to be more visible. She needed to be less rigid. She needed to be more caring. She needed to check in more with staff. She lacked empathy. She didn't focus on vulnerability, trust, relationships. And she suggests that those are, and they certainly could be stereotyping, sexual stereotyping, and that she felt she perceived them to be. And it seems unquestionably that a number of these comments did form the basis for her supervisor's conclusion that she needed to be demoted. So tell me, what was your response? Because the district court really didn't do any analysis separately at the Rule 50 stage or at the summary judgment stage before that. So we don't really have any analysis of this separate and apart. Sex discrimination claim. I'm sorry. Go ahead. So the problem with her assertion that she was told, for example, you need to be more nurturing. We drilled down on that in her testimony, and the record reflects that what she said was there was a comment that said she lacked good communication and that she interpreted that to mean you need to be more nurturing, not that she was actually told you need to be more nurturing. Well, there were certainly other comments that she was, that the supervisor was apparently very concerned about that also were, I think could certainly be considered sex stereotyping. Lacked empathy, too rigid, need to be more caring, check in more with staff. Vulnerability, not showing enough vulnerability. Trust, wasn't developing trust in her relationships. I mean, what about all of that? Well, I think. That was there. It was in the notes. And she said she got some of that and she understood it and she perceived it as stereotyping. What else does she need? Well, she needs to show that it actually was gender stereotyping. How does she do that? Well, she does that by, one, she could have called witnesses to testify to that. But the undisputed.  She could have called Diana Roybal. She could have called, she could have asked Perry. Diana Roybal was, these comments were all given to her right through this report, right? She didn't talk to these witnesses individually, is that right? Roybal talked to all the witnesses individually. Okay, she did, and these were her notes. Yes, she did. Okay. Yeah, so there are two sets of notes. She spoke to them. There's the listening tour, and she could have called Casey, I'm going to forget Casey's last name. She was the union rep, Carson Rose. She could have called Carson Rose, who was part of the listening tour, to testify about that. Or any of the other named people in the listening tour that had those comments. So she needed to, for Title IX purposes, she needs to prove that the people who made these comments, that may easily be perceived as stereotyping, that they intended them to be stereotyping? I think she needs to prove that the comments were stereotyping, and she testified she wasn't sure because she didn't have enough background. I think she also needs to be able to prove that these comments impacted, the comments she perceived as stereotyping, because there are pages and pages of comments which are not stereotyping. And she needs to be able to prove that the comments that she subjectively believed were stereotypes are what the decision was based upon, and she simply didn't do that. She could have asked Perry about that when Perry was on the stand. I thought there was something in your brief that the supervisors rejected those statements in the listening tour. There is. That came directly from Ms. McEnyon. Ms. McEnyon testified, my supervisors said they disagreed with this, which completely undermines the argument that the decision was made based upon the gender stereotyping comments. The fact that Ms. McEnyon believed other comments, like she's smart, were a gender stereotype, that's subjective belief. The fact that she believed you need to be more visible is gender stereotyping. That's a requirement for all principals in Cherry Creek School District. It just means get out in your school. And there were copious complaints that were considered by the decision makers here, by first Perry who recommended a Siegfried and then Siegfried, that Ms. McEnyon was not visible in the schools, that kids didn't know who she was. That was concerning to them, and that's what the record reflects. The record doesn't reflect that they were concerned she wasn't nurturing. You've gone over a minute 48. I have. My apologies. Do you want to finish your thought or if you have further questions? I'm on. Just finish your thought, but don't take too much time. Okay. The burden of proof here was on Ms. McEnyon to prove that gender was the basis for the actions against her, and she didn't meet that burden. Ms. Bankert, I think a minute will be enough for your rebuttal. Will a minute be enough for rebuttal? I think so. I'll talk really, really fast. As to comparators, as we note in our brief on page 15, opening brief, Smith was involved. Superintendent Smith was involved in the decision to demote Ms. McEnyon, and he was chief of staff to Siegfried. Siegfried was also a supervisor of Langdon for a bit. There are cases, LaCase and Ebraham, that say that it is not the immediate supervisor you look to in a comparator case. It is the ultimate decision maker. There is a lot of cases saying that. Your brief has cited cases saying that. Yes, Your Honor. The board has ultimate authority over all decisions. EPA, again, Cherry Creek says that they made the decision according to policies, but those were policies in effect for years. As to stereotyping, they offered nothing. Cherry Creek offered nothing in response to Ms. McEnyon's comments on stereotyping, because it was Rule 50 dismissal. Thank you, Counsel. Thank you, Your Honor, and I appreciate the extra time. Thank you all. Case is submitted. Counsel is excused. Thank you both.